UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TERRYLLE BLACKSTONE,<br><br>Defendant. | No. 23-CR-123 (RDM) |

## STATEMENT OF THE OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, TERRYLLE BLACKSTONE, with the concurrence of his attorney agree and stipulate as follows:

### *Synergy Law LLC*

1. In or about January 2018, BLACKSTONE began working for Synergy Law LLC. When BLACKSTONE began working there, Synergy Law held itself out as a "national law firm" based in Washington, D.C., although all of the company's operations were in Manassas, Virginia. Synergy Law had no business operations in the District of Columbia. BLACKSTONE's first position was with the company's collections department where he was responsible for securing payments from clients.

2. A few months after he started working at Synergy Law, BLACKSTONE was promoted to be the Operations Director with supervisory authority for approximately 30 to 40 employees in Manassas, Virginia. In that position, he reported directly to David Maresca, who taught BLACKSTONE how Synergy Law operated.

3. Maresca owned 90 percent of Synergy Law. Maresca was not an attorney. Scott Marinelli owned 10 percent of Synergy Law; lived in New Jersey; and was, supposedly, a member

of the D.C. Bar. Marinelli visited the Manassas office about one a month. Maresca oversaw all of the day-to-day operations at Synergy Law. Maresca once told BLACKSTONE that Maresca was an "acting attorney" because Maresca took guidance from Marinelli.

4. Synergy Law had a Sales Department and an Operations Department. The Sales Department solicited potential clients by placing telephone calls from lead lists. These potential clients were distressed homeowners who faced the prospect of losing their homes. When BLACKSTONE began work at Synergy Law, the company purported to provide foreclosure defense services to clients.

5. The Sales Department at Synergy Law used various scripts during calls to prospective clients. The full script was approximately 19 pages long and Maresca required all sales employees to memorize the script. BLACKSTONE knew that these scripts included the following promises to clients that BLACKSTONE, Maresca, and Marinelli all knew to be false and misleading:

    a. that Synergy Law was a "national law firm";

    b. that an attorney would review the homeowner's case file;

    c. that the firm would not take the client's case until after an attorney reviewed the client's file and accepted the case;

    d. that this attorney knew their lender's "internal guidelines" for a "mortgage resolution";

    e. that an assigned "legal team" would contact the homeowner's lender to negotiate a resolution; and

    f. that the firm's attorneys would represent the client in court against the client's lender.

As BLACKSTONE, Maresca, and Marinelli knew, these representations were false and fraudulent. Synergy Law never operated a "national law firm" and never provided legal services to homeowners. Synergy Law never had attorneys review all homeowner files and Synergy Law never had attorneys contact a client's lender to discuss a mortgage resolution. Synergy Law never filed a lawsuit on behalf of a client and never entered an appearance in any civil suit brought by the client's lender. As a result of these marketing efforts, Synergy Law entered into retainer agreements with thousands of clients.

6. BLACKSTONE knew that there were no attorneys working at Synergy Law's office in Virginia and that an attorney did not review each client file as promised. Instead, Maresca who was not an attorney, reviewed all client files and made decisions about whether a potential client's case would be accepted. Maresca also determined the fees that would be charged to the client. Synergy Law clients typically paid a retainer fee between $900 and $1,500, plus a monthly recurring fee of between $450 and $1,000. Those monthly recurring fees were automatically billed to a client's credit card. Synergy Law's retainer agreements with clients promised that Synergy Law would provide "legal representation," "attorney services," and "legal services" to the client.

7. BLACKSTONE was the Director of the Operations Department which handled all work on behalf of clients after the client retained Synergy Law. BLACKSTONE oversaw the work of approximately 35 people in his department. No one who worked in BLACKSTONE's department was an attorney.

8. Even though no one who worked for BLACKSTONE was attorney, BLACKSTONE's department at Synergy Law often advised clients to ignore foreclosure hearings so that Synergy Law could submit a package to the lender in support of a loan modification that would stop the foreclosure. BLACKSTONE's department at Synergy Law also often advised

3

clients to file Chapter 13 bankruptcy petitions *pro se*—i.e., without the assistance of counsel—to stop the sale of their homes. BLACKSTONE's department at Synergy Law told these clients to tell the bankruptcy court that they had filed for Chapter 13 protection on their own without the assistance of counsel "because this is a pro se process."

9. During 2017 and 2018, BLACKSTONE learned that Marinelli had been disbarred in New York and New Jersey, and that the D.C. Bar had suspended Marinelli's license. BLACKSTONE knew that Marinelli was the only attorney—licensed or unlicensed—who was a member of Synergy Law. BLACKSTONE knew that Synergy Law could not continue to operate in the same manner.

10. Between January 2019 and June 2019, Marinelli was incarcerated in Pennsylvania. BLACKSTONE and Maresca both knew about Marinelli's incarceration. During that time, BLACKSTONE and Maresca continued to operate Synergy Law without Marinelli in the same manner even though Marinelli could not practice law or have contact with clients.

11. During 2018 and 2019, bankruptcy judges, Synergy Law clients, and the U.S. Trustee's Program raised concerns about Synergy Law's practices in bankruptcy matters. On February 1, 2019, BLACKSTONE appeared before a U.S. Bankruptcy Judge in the Southern District of Texas and told the Court that his half-sister—Person A—was the "managing attorney" at Synergy Law who had replaced Marinelli.

12. On or about July 19, 2019, BLACKSTONE testified under oath in a deposition taken by the U.S. Trustee for the Southern District of Georgia. BLACKSTONE testified that there were no attorneys physically located in the Synergy Law office in Virginia who could provide advice to clients who called Synergy Law on a daily basis. BLACKSTONE also testified that Maresca and Marinelli were the only owners of Synergy Law.

4

13. During BLACKSTONE's employment with Synergy Law, BLACKSTONE, Maresca, Marinelli, and others used the interstate wires in order to operate their "law firm" in ways that were essential to the scheme, such as soliciting clients by telephone.

14. On or about the following dates, BLACKSTONE, Maresca, Marinelli and others used the mail or caused the mail to be used in ways that were essential to the scheme:

| DATE | MATTER AND THING TO BE SENT AND DELIVERED |
|---|---|
| April 17, 2019 | One Federal Express envelope that arrived in Washington, D.C., addressed to Synergy Law and was forwarded to Synergy Law's office in Virginia |
| April 23, 2019 | One item of certified mail that arrived in Washington, D.C., addressed to Synergy Law and was forwarded to Synergy Law's office in Virginia |
| May 6, 2019 | One item of certified mail that arrived in Washington, D.C., addressed to Synergy Law and was forwarded to Synergy Law's office in Virginia |
| May 13, 2019 | One UPS envelope that arrived in Washington, D.C., addressed to Synergy Law and was forwarded to Synergy Law's office in Virginia |
| May 21, 2019 | One UPS envelope that arrived in Washington, D.C., addressed to Synergy Law and was forwarded to Synergy Law's office in Virginia |

***Themis Law PLLC***

15. In approximately June 2019, Maresca registered a new company called Themis Law PLLC in the District of Columbia which purported to be a law firm. Masresca was a 90 percent owner of Themis Law. Sam Babbs, III, was a 10 percent owner. Babbs lived in Florida

but was licensed to practice law in the District of Columbia.

16. In approximately August 2019, Synergy Law itself filed for bankruptcy in the U.S. Bankruptcy Court for the District of Columbia. Two months before filing for bankruptcy, the majority of Synergy Law's clients were transferred to Themis Law. Themis Law continued providing the same services on the same terms to clients; employees who worked for Synergy Law began working for Themis Law; and Themis Law began occupying the same office space that had been previously used by Synergy Law; BLACKSTONE's position changed to include additional responsibilities ~~responsibilities did not change~~. The only difference in the operation of Themis Law from Synergy Law, besides the name, was that 10 percent of the company was owned by Babbs instead of Marinelli.

17. Themis Law used call center workers in the same fashion as Synergy Law. These call center workers used a script written by Maresca, who required all workers to memorize the script. BLACKSTONE knew that the script used by Themis Law call center workers included false statements that Themis Law was a "national law firm," that that the firm would not take the client's case until after an attorney reviewed the client's file and accepted the case, and that a Themis Law attorney would represent the client in court against the client's lender.

[Handwritten margin note: His title was Attorney liaison.]

18. BLACKSTONE knew that Themis Law did not provide legal services to clients as promised in their retainer agreements but Themis Law continued to collect monthly payments from clients. BLACKSTONE knew that when clients of Themis Law faced imminent foreclosure, Themis Law advised those clients to consider filing for bankruptcy to save their home. Themis Law referred these clients to Babbs at Babbs Law Firm. Those clients then signed a new retainer agreement and paid additional fees to Babbs.

19. During BLACKSTONE's employment with Themis Law, BLACKSTONE, Maresca, Babbs and others used the interstate wires in order to operate their "law firm" in ways

that were essential to scheme, such as soliciting clients by telephone.

20. On or about the following dates, BLACKSTONE, Maresca, Babbs and others used the mail in ways that were essential to the scheme:

| DATE | MATTER AND THING TO BE SENT AND DELIVERED |
|---|---|
| September 16, 2020 | Tax returns for undercover law enforcement officer placed in U.S. mail in Washington, D.C., for delivery to Themis Law in Virginia |
| September 25, 2020 | Authorization form placed in U.S. mail by Themis Law for delivery to an undercover law enforcement agent in Washington, D.C. |

***Personal Gain, Loss Amount, and Victim Impact***

21. BLACKSTONE worked for Synergy Law and Themis Law as an independent contractor from on or about January 12, 2018, until on or about April 12, 2021. During that time, the firms paid BLACKSTONE no less than $163,199.30 for his work at Synergy Law and Themis Law.

22. During BLACKSTONE's time working for Synergy Law and Themis Law, clients of the "law firms" paid "fees" of no less than $12,349,419.18 for purported "legal services" that were never provided.

23. BLACKSTONE and his co-conspirators caused substantial financial hardship to more than 25 clients of Synergy Law and Themis Law. More than 25 clients lost their homes; made substantial changes to their living arrangements, such as relocating to a less expensive home; filed for bankruptcy without the assistance of legal counsel in order to save their homes; suffered

substantial losses to savings or retirement funds; or incurred substantial harm to their ability to obtain credit.

## Limited Nature of Statement of Facts

This proffer of evidence is not intended to constitute a complete statement of all facts known by BLACKSTONE or the government. Rather, it is a limited statement of facts intended to provide the minimal necessary factual predicate for the defendant's guilty plea.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By: _____
JOHN W. BORCHERT (Bar No. 472824)
Assistant United States Attorney
Fraud, Public Corruption & Civil Rights Section
601 D Street, NW
Washington, D.C. 20530
(202) 252-7679

**DEFENDANT'S ACCEPTANCE**

I have read every word of this Statement of Offense. Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, after consulting with my attorney, Dwight Crawley, Esq., I agree and stipulate to this Statement of Offense. The Statement of Offense is a summary made for the purpose of providing the Court with a factual basis for my guilty plea. It does not include all of the facts known to me regarding these offenses. I make this statement knowingly and voluntarily and because I am in fact guilty of the crime to which I am pleading guilty.

Dated: 5/14/2024

_____
TERRYLLE BLACKSTONE
Defendant

**ATTORNEY'S ACKNOWLEDGEMENT**

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense.

Dated: 5/14/2024

_____
DWIGHT CRAWLEY, ESQ.
Attorney for Terrylle Blackstone