**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 23-CR-123-1 (RDM)** |
| | : | |
| **DAVID MARESCA,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' OPPOSITION TO DEFENDANT DAVID**
**MARESCA'S MOTION TO SUPRESS SEARCH WARRANT EVIDENCE**

Defendant David Maresca's motion to suppress misstates the facts and misconstrues the applicable law. As a factual matter, Maresca is simply wrong about his claim that the government is responsible for a "forty-four month" delay in executing the warrants at issue. And Maresca's claim that the government has acted unreasonably in executing the warrants lacks foundation in the case law. Moreover, there should be little doubt that the government has acted in good faith since the time that the warrants were executed. His motion should be denied.

**BACKGROUND**

As charged in the Indictment, defendant David Maresca and his coconspirators scammed thousands of homeowners who faced foreclosure by falsely telling them that they were a "national law firm" that could save their homes. (ECF[1] 1 ¶¶ 7-8.) They collected millions of dollars in putative "legal fees." (*Id*. ¶¶ 7, 10(x).) But this "law firm" was little more than a charade. The purported firm never provided legal advice or legal services that had been promised to the victims. (*Id.*) Victims never even spoke to an attorney and fell further into debt—often losing their homes

---

[1] "ECF #" refers to the docket entries for this case at the indicated number. "ME" refers to the minute entries for the docket in this case. "Ex. #" refers to the attachments to this filing at the indicated number.

or filing for personal bankruptcy.  (*Id.*)

### A.    The Search Warrants

On May 4, 2021, law enforcement applied for search warrants to search two locations used by the conspirators: (1) the boiler room call center in Manassas, Virginia, that the conspirators called a "law firm" and used as a base of their operations (the "Office Warrant"); and (2) the Virginia residence of David Maresca, who was one of the architects of the scheme (the "Residence Warrant").  Both warrants authorized the seizure of documents and other evidence, such as digital devices.  Both warrants included a list of items that could be seized as evidence at Attachment B. In accordance with Federal Rule of Criminal Procedure 41(e)(2)(B), both warrants authorized a two-step process for the seizure of digital evidence in which devices would be imaged and reviewed offsite for responsive materials.  Given the possibility that either or both of those locations might contain documents subject to a claim of attorney-client or work product privilege, both search warrants included filter protocols.[2]

On May 6, 2021, law enforcement agents executed both warrants.  The Office Search Warrant was executed by a Filter Team of government agents.  The office space consisted of numerous rooms and cubicles. (Ex. 1.) The Filter Team collected ninety-nine items of evidentiary value that were placed in bags and boxes.  (Ex. 2 ("Office Log").)   The Filter Team only seized physical evidence—*i.e.*, documents—that were within the scope of the search warrant.  (Ex. 3 at 1-2.)   The Filter Team also collected three smartphones and eleven forensic images of digital devices for further review off-site as permitted by the two-step warrant.  (Office Log Nos. 93, 95-96, 98-99.)

---

[2] The filter protocols for the Office Warrant and the Residence Warrant are described in greater detail in two other government filings.  (ECF 71 at 2; ECF 80 at 8-9.)

The Residence Warrant was executed by a different team of agents from the FBI and IRS-CI.  Those agents collected fifty-four items of evidentiary value.  (Ex. 4 ("Res. Log").)    All physical evidence seized was within the scope of the search warrant.  These items of physical evidence included thirty boxes of client files, financial records for the "law firm," and training manuals for the "law firm."  (Res. Log Nos. 15, 17-19, 22-23, 25.)  The search team at Maresca's residence also seized fifteen digital devices for further review off-site as permitted by the two-step warrant.  (Office Log Nos. 1-5, 7-9, 11-14, 16, 20-21.)

On May 6, 2021, shortly after the completion of the searches, FBI Special Agent Melissa Lawrence submitted a request for the Computer Analysis Response Team ("CART") to create duplicate forensic images of all digital media seized during the execution of those warrants.  (Ex. 5.)  On September 10, 2021, CART informed Special Agent Lawrence as follows:

> The submitted items were labeled, photocopied, and inventoried. Images were created and mobile device extractions were completed. The images and extractions were archived to forensically clean media.  MD5HASH values were verified.

(*Id.*)

### B.    The Pre-indictment Filter Process for the Search Warrants

In this matter, the Filter Team faced unusual and significant logistical challenges, including addressing and resolving potential attorney-client privilege issues for thousands of third-party client-victims of Maresca's sham law firm who had their own privilege interests distinct from those of the fraud co-conspirators posing as their lawyers—and doing so across a large set of material between the two locations searched.  That is, unlike other filter teams, the privilege issues here were not necessarily narrow nor limited to privilege claims of the several co-conspirator defendants, each of whom might assert different privilege claims.  Over the course of several

months after the May 2021 searches, as it navigated these issues, the Filter Team conducted interviews with five individuals who, in the government's assessment, could have offered legal advice at Mr. Maresca's fake law firm.[3]  One purpose of those interviews was to ascertain whether call center scripts which Maresca's employees used to contact victims could be subject to a claim of attorney-client or work product privilege.  Those interviews concluded during September 2021.

At approximately the same time, Mr. Maresca's counsel and the government began to discuss a pre-indictment resolution of Maresca's matters.  On September 14, 2021, counsel for Mr. Maresca executed a tolling agreement with the government which extended the statute of limitations for a three-month period (the "Term") because "[Maresca] would like additional time for his counsel to confer with representatives of the government."  (Ex. 6 ¶ 2.)  The agreement further provided:

> [Maresca] agrees not to plead, argue, or otherwise raise any defense based upon pre-indictment delay, laches, estoppel or other similar defenses or time limitations (whether constitutional, statutory, contractual, or otherwise) based upon pre-filing delay that includes the Term as part of the defense.

(Ex. 6 ¶ 6.)  Shortly after entering into this tolling agreement, on October 19, 2021, members of the Prosecution Team met with Maresca and his counsel for a reverse proffer at the U.S. Attorney's Office for the District of Columbia.  (Ex. 7.)  The government proposed a pre-indictment resolution for Maresca's consideration.  Maresca through his counsel rejected that proposal.  The agreed-upon Term for discussion of a resolution concluded on December 19, 2021. (*Id.*)

Following the expiration of the Tolling Agreement and Maresca's rejection of a resolution,

---

[3] The government has produced the FBI FD-302s for all of these interviews to the defendants during discovery.  *See* 7/22/21 Interview of J. Sherman (SYN-0070908); 9/27/2021 Interview of L. Blackstone (SYN-0070960); 10/1/2021 Interview of R. Berleth (SYN-0071064); 9/21/21 Interview of C. Stewart (SYN-0070007); 9/24/21 Interview of C. Stewart (SYN-0070008); 10/4/2021 Interview of S. Babbs (SYN-0071096).

the Filter Team faced a complicated assignment.  The storage media from the Residence Warrant and the Office Warrant contained at least four types of potentially privileged information: (1) communications between thousands of victim "clients" and the fake law firm; (2) communications between the fake law firm and attorneys representing the fake law firm; (3) communications among attorneys involved in the operations of the fake law firm and the non-attorney members of the conspiracy; and (4) attorney work product.  These circumstances were further complicated by the fact that none of the client-victims were represented by counsel with whom the Filter Team could consult concerning privilege claims.[4]  Resolving privilege issues across all of the warrant materials might require *ex parte* litigation without the benefit of counsel for all of the numerous potential privilege holders.  In consultation with the Prosecution Team, the Filter Team focused its review efforts on two types of materials that were important to the prosecution and could be effectively released without the need for *ex parte* litigation before a judge over privilege issues: (1) call center scripts, and (2) financial records.

On January 31, 2022, an attorney for the Filter Team contacted Maresca's counsel to discuss whether call center scripts could be provided to the Prosecution Team.  (Ex. 8 at 3-5.)  The Filter Team attorney informed Maresca's counsel that the Filter Team needed to know counsel's position by no later than Friday, February 18, 2022.  (*Id*. at 1.)  Counsel for Maresca did not respond to the Filter Team prior to that deadline.[5]  Shortly thereafter, the Filter Team informed the

---

[4] The Filter Team's prioritization of these materials was discussed with the Court at a prior hearing. (8/27/24 Hearing Tr. at 33-34.)

[5] In December 2021, the other defendant-coconspirators (Scott Marinelli  and Sam Babbs III) did not have counsel who were in contact with either the Prosecution Team or the Filter Team, limiting the ability of the government pre-indictment to meaningfully discuss privilege issues those defendant-coconspirators might assert.

Prosecution Team that call center scripts recovered during the May 2021 searches could be released from the Filter Team to the Prosecution Team.

Between March 16 and March 30, 2022, seven FBI agents with the Filter Team reviewed thousands of documents recovered during the May 2021 searches. (Ex. 9.) The purpose of this review was to identify any call center scripts that could be provided to the Prosecution Team. The Filter Team segregated all blank call center scripts from the evidence recovered in May 2021 and provided those documents to the Prosecution Team in hard copy; those documents were scanned and documented in the FBI case file on or about April 1, 2022. (Ex. 10.)

On or about March 2, 2022, the Filter Team determined that "all spreadsheets and tax records can be provided to the investigative team." (Ex. 11 at 3.) In accordance with that direction, Special Agent Lawrence requested that CART extract all files with any of seventeen file extensions[6] from the media that CART had prepared for searches in September 2021. (*Id.*) CART began its work on that request on March 14, 2022. (Ex. 12 at 1.) On June 22, 2022, the Filter Team began to process and ultimately provide the results of those searches to the Prosecution Team. (Ex. 13.) The Filter Team completed its review of all the devices and made the search results available to the Prosecution Team in or about February 2023. (Ex. 12.)

### C.    The Post-Indictment Filter Process

On April 13, 2023, a grand jury in this District returned an indictment against Mr. Maresca and three other defendant-coconspirators (Scott Marinelli, Terrylle Blackstone, and Sam Babbs III). (ECF 1.) Maresca was arrested on a warrant on May 3, 2023. (ECF 6.) At his initial

---

[6] Those file extensions were as follows: .XL*, .XML, .CSV, .ODS, .TSV, .TAB, .1PE, .1PH, .3ME, .3PE, .DGC, .T09, .TAX*, .TVL, .QB*, .QWC, and .LOG. Records with those extensions can be useful when investigating possible tax offenses, money laundering, and other financial crimes.

appearance before Magistrate Judge G. Michael Harvey, Maresca was represented by stand-in counsel.  (5/3/23 ME.)  On May 11, 2023, the Federal Public Defender entered an appearance on behalf of Maresca.  (5/11/23 ME.)

On July 20, 2023, the parties filed a joint status report informing the Court that the Filter Team intended to make a significant production of documents the following week.  (ECF 33 ¶ 6.) On July 31, 2023, the Filter Team made a production of approximately 1,600 documents to all of the defendants that included documents seized during the May 2021 searches and requested that Maresca's counsel inform the Filter Team "whether they objected to any of those materials being provided to the prosecution team." (ECF 37 ¶ 7.)  Maresca's counsel responded on December 8, 2023, that there were "over 450 documents that are not privileged and we have no problem being provided to the case team."[7]  (Ex. 14.)  However, counsel for a separate defendant did not authorize the release of those documents to the Prosecution Team until January 19, 2024. (Ex. 15.) Thereafter, the Filter Team released those 452 documents to the Prosecution Team.

Among other things, the 452 documents released to the Prosecution Team with the consent and approval of Maresca's counsel include sixty-five pages of records seized pursuant to the Residence Warrant such as bank records; the closing documents for the defendant's residence which is the subject of a money laundering charge; checks paid and received by members of the conspiracy; tax records; payroll checks to employees; and records showing the gross receipts of the fake "law firm."  (Ex. 16 at 2-6, 8-9, 15, 17-18.)

On January 30, 2024, the Filter Team provided counsel for Maresca—and all other

---

[7] Due to a miscommunication among the parties, the Joint Status Report on September 22, 2023, misstated that Maresca had no objection to the release of those documents.  Maresca's counsel notified the government and the government has respected Maresca's assertion of privilege as clarified by his counsel.

defendants—with copies of the full forensic images of all storage devices seized during the May 2021 searches.  (ECF 50 ¶ 5; ECF 63 at 6.)  To facilitate this process, the Filter Team requested that counsel for Maresca provide privilege search terms that could be run across all of the storage devices from the May 2021 searches.  (*Id.*)  Counsel for Maresca declined to provide any search terms that would assist the Filter Team in segregating potentially privileged documents from the seized materials. (*Id.*; ECF 71-2.)

Facing this impasse, the Prosecution Team filed two motions seeking to compel the production of all materials from the May 2021 searches.  (ECF 71; ECF 80.)  Maresca's counsel opposed those motions.  (ECF 76; ECF 85.)  At a hearing before the Court on those motions, the Court stated the following to Maresca's counsel:

> I have got to tell you.  That strikes me as completely ridiculous and obstructionist.  The filter team has invited you and said, if you think there is something privileged here, tell us what it is.  And you have said to them, no, we are not going to help you do that, we think it is your burden to find anything.  That strikes me as really trying to obstruct things here or certainly not trying to advance it in any meaningful way.

(9/3/24 Hearing Tr. at 32.)  The Court then directed Maresca's counsel to provide the Filter Team with terms or searches that the Filter Team should use to identify privileged materials from the May 2021 searches.  (*Id.* at 33, 36, 38.)  The next day, September 4, 2024, Maresca's counsel provided the Filter Team with a list of 117 filter search terms that the Filter Team could use to identify potentially privileged materials.  (ECF 89 ¶ 4; ECF 110 ¶ 4.)

The Filter Team began running Maresca's 117 filter search terms across each of the storage media imaged in connection with the May 2021 searches, *i.e.*, twenty-nine total devices.  (10/15/24 Hearing Tr. at 17.)  Pursuant to procedures developed among the parties with the Court, the Filter Team also applied relevance search terms to further assist counsel's review.   (10/15/24 Hearing

Tr. at 78-86.)  The Filter Team then provided those search results to Maresca's counsel throughout the remainder of the calendar year:

- On October 23, 2024, the Filter Team provided Maresca's counsel with a production of filter term hits for ten storage media.  (11/14/24 Hearing Tr. at 20.)   On November 8, Maresca's counsel responded that they had no objection to those materials being provided to the Prosecution Team.  (*Id.*)

- On November 14, 2024, the Filter Team provided Maresca's counsel with the filter term results for eight additional storage media.  (*Id.*)  On December 2, 2024, Maresca's counsel responded that they had no objection to those materials being provided to the Prosecution Team.  (*Id.*)

- On December 5, 2024, the Filter Team provided Maresca's counsel with an additional production of materials that were seized and scanned from the May 2021 residential search.  (ECF 135 ¶ 3.)  On January 10, 2025, Maresca's counsel responded that they were not asserting privilege as to any of those documents.  (*Id.*)

- On December 19, 2024, the Filter Team provided its final production of materials from the May 2021 search materials.  As of this filing, Maresca's counsel are continuing to review those materials but have not to date identified any privileged materials.

As of December 31, 2024, the Filter Team provided search term results to counsel for Maresca for all of the storage media seized during the execution of the Office Search Warrant and all in-scope hardcopy documents from the execution of the May 2021 search warrants.  (*Id.*)   And counsel for Maresca have not identified any privileged documents for the Filter Team from any of the May 2021 searches.  (*Id.*)

ARGUMENT[8]

**I.    Maresca's Assertion of "Forty-Four Months"**
**of Government Delay is Contrary to the Facts**

The core of the defendant's Fourth Amendment challenge is his claim that the government

has unreasonably delayed the execution of the May 2021 search warrants.  Mr. Maresca describes

the period of delay (at 1) as "more than three years" and appears to reach this calculation (at 4) by

counting "forty-four months" between the May 2021 searches and January 2024.[9]  Such a

calculation is dubious at best.

With respect to physical evidence—*i.e.*, documents recovered during the execution of the

Residence Warrant and the Office Warrant—the defendant's claim of delay is simply non-existent.

In executing both warrants on May 6, 2021, law enforcement agents recovered only physical

documents that were within the scope of Attachment B to the search warrants.  (Ex. 3 at 1.)  The

defendant acknowledges (at 3) that those items of physical evidence consist of 250,000 pages of

hard-copy documents.  And the defendant does not even suggest that any of those materials are

---

[8] The government notes and preserves its argument that the defendant lacks standing to assert a Fourth Amendment claim as to many of the items recovered during the May 2021 searches—an issue the defendant does not address at all in his motion.  Although the Prosecution Team has not yet reviewed all of the devices at issue, Maresca likely does not have Fourth Amendment standing as to many of them.  For example, the defendant appears to concede (at 4) that phones and tablets seized in execution of the Residence Warrant belonged to other persons.  And it is not at all obvious that Maresca has a reasonable expectation of privacy and, therefore, standing as to all of the locations within the office premises which had many open areas.  (Ex. 1.)  *See, e.g.*, *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987) ("An office is seldom a private enclave free from entry by supervisors, other employees, and business and personal invitees.").    It is axiomatic that "defendants always bear the burden of establishing that the government violated a privacy interest that was protected by the Fourth Amendment." *United States v. Sheffield*, 832 F.3d 296, 305 (D.C. Cir. 2016).

[9] It is not clear what significance Maresca attaches to the January 2024 date.  In a Joint Status Report filed on January 22, 2024, the parties noted that Maresca was "continuing to review" discovery and had requested additional time to "discuss a possible resolution with the government."  (ECF 40 ¶¶ 1, 6.)

10

outside the scope of the warrants or that the government delayed in collecting them.

Moreover, Maresca expressly waived any claim of unconstitutional delay in the execution of the May 2021 searches during the term of the tolling agreement that Maresca executed with the government in September 2021.  Maresca asked for the tolling agreement because he wanted "additional time for counsel to confer with representatives of the government." (Ex. 6 ¶ 2.)  In the agreement, Maresca agreed "not to plead, argue, or otherwise raise any defense based upon pre-indictment delay … (whether constitutional, statutory, contractual, or otherwise) … that includes the Term as part of the defense." (Ex. 2 ¶ 6.)  At a minimum, Maresca's calculation of "forty-four months" of delay fails to exclude the three-month Term of the tolling agreement.

But Maresca's calculation of the delay also fails to exclude other periods of time when his own conduct is responsible for any delay in execution of the May 2021 searches.  Those periods of time should include at least the following:

- Maresca's counsel never responded to a request from the Filter Team on January 31, 2022, that counsel state whether call center scripts could be provided to the Prosecution Team without objection.  Consequently, the Filter Team did not begin its search for blank call scripts until March 2022. (Ex. 8.)

- Maresca's counsel required nearly six months—from July 31, 2023, until December 8, 2024—to inform the Filter Team that 452 documents from the May 2021 searches could be provided to the Prosecution Team. (Ex. 14.)

- For over six months—from January 30, 2024, until September 4, 2024—Maresca's counsel declined to identify any privileged materials for the Filter Team and declined to provide search terms that would assist the Filter Team in its work. (9/3/24 Hearing Tr. at 32.)  The Court called this "completely obstructionist and ridiculous." (*Id.*)

Indeed, Maresca's counsel has repeatedly informed the Court that they needed additional time to review materials provided by the Filter Team. (ECF 38 ¶ 7; ECF 40 ¶ 8; ECF 43 ¶ 7; ECF 50

¶¶ 4-5; ECF 92 ¶ 2). The government has acceded to all of those requests for additional time. It is disingenuous for Maresca now to claim "forty-four months" of unreasonable delay have occurred when Maresca himself contributed to much of that delay and the government—in good faith—allowed Maresca additional time to review materials provided by the Filter Team.

## II.    Maresca's Motion to Suppress Should be Denied

As discussed above, Mr. Maresca's calculation of unreasonable delay misses the mark in several respects. But even assuming *arguendo* that the government's completing its review of digital media from the May 2021 searches took a period of months (excluding the delays caused by the defense), the government has acted reasonably in conducting those searches consistent with Rule 41 and the Fourth Amendment. Consequently, suppression is not warranted.

### A.    Applicable Legal Principles

The Fourth Amendment protects "[t]the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST., AMEND IV. This right is protected, in part, through the requirement that warrants be supported by probable cause. *Id.* In addition, the warrant itself must be executed in a reasonable matter. *See United States v. Heldt*, 668 F.2d 1238, 1256 (D.C. Cir. 1981) ("Of course, even when the search warrant meets both the probable cause and particularity requirements, the search itself must be conducted in a reasonable manner, appropriately limited to the scope and intensity called for by the warrant.") "[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 257 (1979). The manner of a search, however, is subject to "later judicial review as to its reasonableness." *Id.* at 258.

Exclusion of evidence, moreover, is not an automatic remedy for a constitutional violation.

"The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies. Indeed, exclusion has always been our last resort, not our first impulse." *Herring v. United States*, 555 U.S. 135, 140–41 (2009) (cleaned up).  The Supreme Court has emphasized that "the exclusionary rule is not an individual right" and has "repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." *Id.* at 141. "[T]he basic postulate of the exclusionary rule [is that t]he rule is calculated to prevent, not to repair.  Its purpose is to deter— to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 (1960). Thus, the exclusionary rule's focus is on whether exclusion will provide a meaningful, worthwhile deterrent to police misconduct.

In all cases, "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas*, 439 U.S. at 131 n.1.  *See also United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) ("A defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional.").

### B.    Law Enforcement has Acted Reasonably in Conducting the Searches of the Digital Media

Federal Rule of Criminal Procedure 41(e)(2)(B) authorizes the Government (1) to copy and retain non-responsive electronically-stored information ("ESI"), and (2) to later review it off-site consistent with the warrant.  The rule rejects a presumptive, uniform time period to conduct the off-site review, understanding that "a substantial amount of time can be involved in the forensic imaging and review of information."  Fed. R. Crim. P. 41, Advisory Committee Note to 2009 Amendment.  The two-step review process is necessary "due to the sheer size of the storage

13

capacity of the media, difficulties created by encryption and booby traps, and the workload of the computer labs." *Id.*; *see also United States v. Burgess*, 576 F.3d 1078, 1097 (10th Cir. 2009) ("The Fourth Amendment does not specify that search warrants contain expiration dates." (cleaned up)).

Consequently, "numerous cases hold that a delay of several months or even years between the seizure of electronic evidence and the completion of the government's review of it is reasonable." *United States v. Jarman,* 847 F.3d 259, 267 (5th Cir. 2017) (cleaned up) (two years to complete search was reasonable where multiple devices belonged to an attorney and required filter review); *United States v. Bradley*, 644 F.3d 1213, 1258 n.95 (11th Cir. 2011) (holding that a three-year delay was not unreasonable to complete a search of 103 computers and one terabyte of data); *United States v. Almaleh*,  No. 17-CR-25, 2022 WL 602069 at *20 (S.D.N.Y. Feb. 28, 2022) (twenty-month period reasonable to review twenty devices); *United States v. Nejad*, 436 F. Supp. 3d 707, 735 (S.D.N.Y. 2019) (three-year period reasonable to review one million documents in three languages); *United States v. Mendlowitz*, No. 17-CR-248, 2019 WL 1017533 at *11-12 (S.D.N.Y. Mar. 2, 2019) (eighteen months was reasonable time to search three servers and three computers); *United States v. Gorrell*, 360 F.Supp.2d 48, 55 n. 5 (D.D.C. 2004) (ten-month delay in analysis of five hard drives was reasonable); *United States v. Sosa*, 379 F. Supp. 3d 217, 222 (S.D.N.Y. 2019) (ten month and fifteen month delays in reviewing seized cell phones were reasonable); *United States v. Wheat*, No. 17-CR-229, 2020 WL 13596203 (N.D. Ga. May 28, 2020) ("I conclude that seventeen months to review more than twelve terabytes of data was not unreasonable, especially when coupled with the complex privilege review that also took place.")

The facts in the case at bar amply demonstrate reasonableness—indeed, diligence and persistence—on the part of the Filter Team from the time of the May 2021 searches until a grand jury returned an indictment in April 2023.

- On site, during the May 2021 searches, the team identified and

seized responsive paper files in executing both the Office and Residence Warrants.

- Law enforcement seized the storage media at issue on May 6, 2021, and immediately submitted the evidence to CART for processing. (Ex. 5 at 1.) CART completed the forensic imaging of those twenty-nine devices four months later in September 2021. (*Id.*)

- The Filter Team conducted six interviews with witnesses in order to determine whether call center scripts could be released to the Prosecution Team. Those interviews concluded in October 2021.[10]

- In December 2021, Maresca rejected a pre-indictment resolution and the Term of the tolling agreement concluded. (Ex. 6.) Thereafter, the Filter Team attempted to engage Maresca's counsel in a dialogue about the call scripts, but Maresca's counsel discontinued those talks with the Filter Team in February 2022. (Ex. 8.)

- During March 2022, the Filter Team deployed a team of seven FBI agents to identify call scripts in the materials seized during the May 2021 searches. (Ex. 9.) Those materials were then provided to the Prosecution Team in April 2022. (Ex. 10.)

- During March 2022, the Filter Team began to run searches using seventeen unique file extensions that might identify non-privileged financial records within the storage media from the May 2021 searches. (Ex. 11.) The Filter Team provided results from those searches until approximately March 2023. (Ex. 12.)

The grand jury returned its indictment on April 13, 2023. (ECF 1.) Maresca was arrested and arraigned before this Court in May 2023. (5/16/23 ME.) Thereafter, the Filter Team continued to demonstrate reasonableness and diligence by further engaging Maresca's counsel concerning the items recovered during the execution of the Residence Warrant and the Office Warrant.

- On July 20, 2023, the parties submitted a Joint Status Report stating that the Filter Team was preparing a production for the defendants. (ECF ¶ 6.)

- On July 31, 2023, the Filter Team produced approximately 1,600 documents from the May 2021 searches to Maresca's counsel. (ECF

---

[10] *See supra* note 3.

37 ¶ 7.)  On December 8, 2023, Maresca's counsel stated no objection to the Filter Team releasing 452 of those documents to the Prosecution Team. (Ex. 14.)

- In January 2024, the Filter Team produced forensic images to counsel for all of the defendants and requested their assistance in identifying privileged documents.  (ECF 50 ¶ 5; ECF 63 at 6.) Maresca's counsel provided filter search terms to the Filter Team on September 4, 2024. (ECF 89 ¶ 4; ECF 110 ¶ 4.)

- After receiving those filter search terms, the Filter Team executed searches with those terms and provided the results to Maresca's counsel for all of the storage media seized in the May 2021 searches. (ECF 135 ¶¶ 1-4.)  These search results were provided on a rolling basis between October and December 2024.  (*Id.*)

Against this factual backdrop, Maresca's assertion (at 1) that the "the government … did all but nothing to search the devices" simply falls flat.  The chronology above demonstrates that the Filter Team has continuously worked to identify responsive and non-privileged materials from among the digital evidence obtained in the May 2021 searches that could be shared with the Prosecution Team since the day of the searches.  The Filter Team's efforts are even more reasonable when one considers the sensitive and fact-intensive issues of attorney-client privilege that necessitated the filter process in the first place; the periods of delay caused by tactics the Court considered "ridiculous and obstructionist" (9/3/24 Hearing Tr. at 32); and the numerous matters other than the May 2021 searches that have required the Filter Team's attention.[11]

The Fifth Circuit's decision in *United States v. Jarman*, 847 F.3d 259 (2017), is particularly instructive.  In that case, the FBI seized several hard drives and computers from the residence of a lawyer who was under investigation for receipt of child pornography.  *Id.* at 263.  A filter team

---

[11] As noted elsewhere, the Filter Team has also been charged with managing the privilege review of devices provided by co-defendant Marinelli to the FBI in a separate investigation; assessing whether documents provided by former employees contain privileged materials; and reviewing materials provided by the Receiver for potential privilege.  (ECF 63 at 4-9.)

spent nearly nine months screening potentially privileged data from the storage media, and the prosecution team required an additional fourteen months with the assistance of CART to identify sexually explicit images within the media. *Id.* In affirming denial of Jarman's motion to suppress, the court found the twenty-three month period of review was "reasonable under the circumstance" because of the need "to protect Jarman's clients' privileged information." *Id.* Moreover, the twenty-three month period was "within the typical periods of delay in executing warrants that courts have permitted due to the complexity involved in searching computers." *Id.* at 267.

The case at bar stands in stark contrast to the authorities cited by Maresca. This is not a case in which the government waited over two years from the time it collected the data to search it. *Cf. United States v. Cawthorn*, 682 F. Supp. 3d 449, 459 (D. Md. 2023) (suppressing search results where "the Government essentially sat on a vast trove of personal data for over two years" without an explanation). Nor is this a case in which the government completely failed to follow the two-step process authorized in Rule 41. *Cf. United States v. Pilling*, 721 F. Supp. 3d 1113, 1120 (D. Idaho 2024) (suppressing evidence where "the government informed the defendant that it had inadvertently failed to conduct the second-step of the two step process"). And this is plainly not a case in which the government retained storage media without any plan to ever review the data or assess whether it was subject to a privilege claim. *Cf. United States v. Metter*, 860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012) (suppressing evidence where government retained "*all* imaged electronic documents…without *any* review whatsoever to determine not only their relevance to this case, but also to determine whether any legal privileges attached to them").

To the contrary, the record before the Court shows that the government—particularly the Filter Team—have been actively engaged in processing and reviewing digital evidence throughout the investigation and litigation of this case. The execution of the May 2021 search warrants,

therefore, has been reasonable and has not violated Maresca's Fourth Amendment rights.

### C.    Even if the Searches were Unreasonable, Exclusion of the Evidence is not Warranted

Even if the duration of the media searches in this case was unreasonable (which it was not), this would not trigger the suppression of the evidence in accordance with the exclusionary rule. As the Supreme Court has explained,

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.  As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Herring v. United States*, 555 U.S. 135, 144 (2009).  The Supreme Court has explained that "the benefits of deterrence must outweigh the costs" and "the extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.*

Maresca argues (at 8) that suppression of evidence is warranted "to deter the government from taking such a cavalier approach to the Fourth Amendment in future cases."  But the facts before the Court amply demonstrate that the government has acted in good faith to execute the Residence Warrant and the Office Warrant with due regard for the sensitivities of potential privilege issues.  The government voluntarily proposed filter protocols for both search warrants consistent with Department policy.  *See* Justice Manual, §9-13.420 – Searches of Premises of Subject Attorneys.  The Filter Team has engaged defense counsel in the filter process to identify materials that the Prosecution Team should not receive and has acceded to every request by Maresca's counsel for additional time to review the documents.  (Ex. 8; (ECF 38 ¶ 7; ECF 40 ¶ 8; ECF 43 ¶ 7; ECF 50 ¶¶ 4-5; ECF 92 ¶ 2.)  The government has only seized physical documents

that are within the scope of Attachment B to the warrants. (Ex. 3 at 1.) And, to date, none of the defendants in this matter can point to a single privileged document from the May 2021 searches that has been inappropriately released by the Filter Team. (ECF 135 ¶¶ 1-4.) There is simply nothing untoward nor unreasonable that the Court should deter. *United States v. Davis*, 564 U.S. 229, 240 (2011) (stating the Supreme Court has "never applied the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct").[12]

It should also be apparent that a search warrant directed to a law firm—even a fake one— presents equities requiring careful time and attention from a filter team. *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 175 (4th Cir. 2019) ("[A]n adverse party's review of privileged materials seriously injures the privilege holder."). The fact that the post-indictment filter process in this case has consumed more than a year speaks to the caution with which such a review must proceed. And one can hardly fault the Filter Team in this case for attempting to engage defense counsel in a dialogue about privileged materials. "About all that exclusion would deter in this case is conscientious police work." *Davis*, 564 U.S. at 240.

In an effort to identify some type of government misconduct, Maresca avers (at 4, ECF 133-1 ¶ 3) for the first time that the Filter Team has provided the Prosecution Team with "a log of the FaceTime calls made on the iPad used by Mr. Maresca's son[.]" That single call log, apparently, was captured in the course of the Filter Team's search for non-privileged spreadsheets and tax records. (Ex. 11 at 3.) This type of inadvertent collection can hardly constitute "deliberate, reckless, or grossly negligent conduct" that should now require suppression. The government did

---

[12] In fact, it was only recently after litigation with Maresca and the other defendants that the Court authorized the Filter Team to release victim "client" files to the Prosecution Team with the limitation that law enforcement cannot use victim information from the warrant materials for any purpose outside of this litigation. (10/15/24 Hearing Tr. 21-22.)

not use that document in any way to pursue an indictment in this case. Maresca makes no suggestion—nor could he—that the seventeen search terms used by the government were designed to target private familial communications rather than financial records. And, having now been notified of the matter, the government can exclude that document from the search warrant results. *Cf. United States v. Chan*, No. 14-CR-203, 2016 WL 627350 (N.D. Ga. 2016) (holding that in execution of search warrant for fraud offenses "[i]t was inevitable that some irrelevant materials would be seized.").

Maresca simply cannot demonstrate that the government has engaged in "deliberate, reckless, or grossly negligent conduct" in the execution of the May 2021 warrants that now warrants deterrence.

### D.    The Government May Lawfully Maintain an Authentication Copy of the Media

Finally, Mr. Maresca suggests (at 5) that the government has engaged in misconduct by maintaining an authentication copy of the full forensic images of the storage media from the May 2021 searches. This assertion is misguided. The government has properly retained full copies of the electronic devices that remain in its possession because it "has an interest in preserving seized electronic devices for purposes of introducing data stored therein at trial." *United States v. Mendlowitz*, No. 17-CR-248, 2019 WL 1017533 at *12 (S.D.N.Y. Mar. 2, 2019).

This principle is well-settled. *See, e.g.*, *United States v. Ganias*, 824 F.3d 199, 215 (2d Cir. 2016) ("Preservation of the original medium or a complete mirror may therefore be necessary in order to safeguard the integrity of evidence that has been lawfully obtained or to authenticate it at trial."). Moreover, "[d]efendants may also require access to a forensic copy to conduct an independent analysis of precisely what the government's forensic expert did … or to locate exculpatory evidence that the government missed." *Id.*

20

## CONCLUSION

For the reasons discussed above, the government respectfully requests that Mr. Maresca's motion seeking to suppress evidence on Fourth Amendment grounds should be denied.

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney

By:  _____
JOHN W. BORCHERT
Assistant United States Attorney
D.C. Bar No. 472824
Fraud, Public Corruption & Civil Rights Section
601 D Street, NW
Washington, D.C. 20530
(202) 252-7679
john.borchert@usdoj.gov

January 21, 2025

CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of January 2025, I caused a copy of the foregoing to

be served on counsel for all parties via the Court's ECF system.

_____
JOHN W. BORCHERT
Assistant United States Attorney